United States District Court
Southern District of Texas
**ENTERED**
March 17, 2016
David J. Bradley, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| BOBBIE CHRISTINE HOLLOWAY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 4:14-cv-02792 |
| | § | |
| CAROLYN W. COLVIN, Acting | § | |
| Commissioner of Social Security | § | |
| Administration, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND ORDER ON CROSS-MOTIONS
FOR SUMMARY JUDGMENT**

Plaintiff Bobbie Christina Holloway ["Holloway"] brings this action pursuant to the Social Security Act, 42 U.S.C. 405(g), seeking judicial review of a final decision by Defendant Carolyn W. Colvin, Acting Commissioner of the Social Security Administration ["Commissioner"], denying her applications for disability insurance benefits ["DIB"] and supplemental security income ["SSI"]. (Complaint, Docket Entry No. 1). The parties have consented to proceed before a United States magistrate judge for all purposes, including the entry of a final judgment, under 28 U.S.C. § 636(c). (Docket Entry No. 9; Docket Entry No. 21; Docket Entry No. 22). Before the court are the parties' cross-motions for summary judgment and supporting memoranda. (Defendant's Cross Motion for Summary Judgment ["Defendant's Motion"], Docket Entry No. 13; Memorandum in Support of Defendant's Cross Motion for Summary Judgment ["Defendant's Memorandum"], Docket Entry No. 14; Plaintiff's Motion for Summary Judgment ["Plaintiff's Motion"], Docket Entry No. 15; Plaintiff's Memorandum of Law ["Plaintiff's Memorandum"], Docket Entry No. 16). Each party has also filed a response to

the competing motions.  (Defendant's Response to Plaintiff's Motion for Summary Judgment ["Defendant's Response"], Docket Entry No. 19; Plaintiff's Response Memorandum in Support of Motion for Summary Judgment ["Plaintiff's Response"], Docket Entry No. 20).

After considering the pleadings, the evidence submitted, and the applicable law, Defendant's motion is GRANTED, and Plaintiff's motion is DENIED.

## I.  Background

Holloway filed applications for DIB, under Title II of the Social Security Act ["the Act"], on August 17, 2011, and for SSI, under Title XVI of the Act, on August 22, 2011.[1]  (Transcript, Docket Entry No. 8, at 13, 118, 123).  In both applications, Holloway claimed that she had been unable to work since January 1, 2008, due to "[h]ip problems," "back problems," "leg problems," and "PTSD."  (Tr. 13, 118, 123, 152).  The Commissioner denied Plaintiff's applications on April 12, 2012, and, again, upon reconsideration, on June 26, 2012.  (Tr. 13, 62, 71).  Plaintiff then successfully requested a hearing before an administrative law judge ["ALJ"].  (Tr. 77).  That hearing took place on March 26, 2013, before ALJ Thomas G. Norman.  (Tr. 30-54).  Plaintiff appeared and testified at the hearing, accompanied by her attorney, Irena Popova.  (*Id.*).  The ALJ also heard testimony from a vocational expert, Karen E. Neilson, and a medical expert, Dr. Hubert James Stewart.  (*Id.*).  At the hearing, Plaintiff amended her alleged onset date to August 15, 2012.  (Tr. 13, 53-54).

---

1. "Disability insurance benefits," or "DIB," are payments that are made "to those persons who are insured, as a result of payroll tax contributions, as well as disabled."  *Whitsett v. Colvin*, No. 1:10-cv-01070-SKO, 2014 WL 806937, at *5 (E.D. Cal. Jan. 27, 2014); *see* 42 U.S.C. § 423(a)(1).  "Supplemental security income," or "SSI," by contrast, is paid to disabled persons with low income.  *Sujo v. Colvin*, No. 2:15-cv-1049-CKD, 2016 WL 1045349, at *1 n.1 (E.D. Cal. Mar. 16, 2016); *see* 42 U.S.C. § 1382 *et seq.*  However, the same five-step sequential analysis applies to eligibility determinations for DIB and SSI.  *McCrea v. Comm'r of Social Sec.*, 370 F.3d 357, 360 n.3 (3d Cir. 2004) (citing *McDonald v. Sec'y of Health & Human Res.*, 795 F.2d 1118, 1120 n.1 (1st Cir. 1986)).

Following the hearing, the ALJ engaged in the following five-step, sequential analysis to determine whether Holloway was disabled:

1. An individual who is working or engaging in substantial gainful activity will not be found disabled regardless of the medical findings. 20 C.F.R. §§ 404.1520(b) and 416.920(b).

2. An individual who does not have a "severe impairment" will not be found to be disabled. 20 C.F.R. §§ 404.1520(c) and 416.920(c).

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will not be considered disabled without consideration of vocational factors. 20 C.F.R. §§ 404.1520(d) and 416.920(d).

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made. 20 C.F.R. §§ 404.1520(e) and 416.920(e).

5. If an individual's impairment precludes performance of his past work, then other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if any work can be performed. 20 C.F.R. §§ 404.1520(f) and 416.920(f).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *Martinez v. Chater*, 64 F.3d 172, 173-74 (5th Cir. 1995); *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991); *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988). It is well-settled that, under this analysis, Holloway has the burden to prove any disability that is relevant to the first four steps. *Wren*, 925 F.2d at 125. If she is successful, the burden then shifts to the Commissioner, at step five, to show that she is able to perform other work that exists in the national economy. *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001); *Wren*, 925 F.2d at 125. "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis." *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

An individual claiming DIB and SSI benefits under the Act has the burden to prove that she suffers from a disability. *See Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Cook v.*

3

*Heckler*, 750 F.2d 391, 393 (5th Cir. 1985).  The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than twelve months."  *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (citing 42 U.S.C. § 423(d)(1)(A)).  "Substantial gainful activity" is defined as "work activity involving significant physical or mental abilities for pay or profit."  *Newton*, 209 F.3d at 452.  A "physical or mental impairment" is "an impairment that results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983) (citing 42 U.S.C. § 423(d)(3)).  The impairment must be so severe as to limit the claimant so that she "is not only unable to do h[er] previous work but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).  It must be stressed that the mere presence of an impairment is not enough to establish a disability under the Act.  *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986)).  Rather, a claimant is disabled only if she is "incapable of engaging in substantial gainful employment."  *Id.*

Based on these principles, as well as his review of the evidence presented at the hearing, the ALJ determined that Plaintiff "ha[d] not engaged in substantial gainful activity since August 15, 2012."  (Tr. 15 ¶ 2).  The ALJ further concluded that Holloway suffered from obesity, gastroesophageal reflux disease ["GERD"],[2] status-post fractured hip, depression, and

---

2.  "Gastroesophageal reflux disease," or "GERD," is a condition in which the stomach contents leak backwards from the stomach into the esophagus, causing a "burning pain" in the esophagus.  MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY 207, 1701 (5th ed. 1998).

posttraumatic stress disorder ["PTSD"].   (Tr. 15 ¶ 3).   Although he determined that these impairments, alone or in combination, were severe, he concluded, ultimately, that Plaintiff's impairments did not meet, or equal in severity, the medical criteria for any disabling impairment in the applicable SSA regulations.[3]  (Tr. 16 ¶ 4).  Drawing from the evidence, the ALJ concluded that Holloway had the residual functional capacity ["RFC"] to perform light work, subject to certain limitations.  (Tr. 18 ¶ 5).  In particular, the ALJ found that Holloway "must avoid heights and climbing ropes, ladders, and scaffolds."  (*Id.*).  He found further that Holloway's RFC precludes her from returning to her past relevant work as a "shift supervisor in the food industry."  (Tr. 22 ¶ 6).  But he also determined that Holloway is capable of performing such jobs as a "laundry sorter," an "assembly parts operator," or an "electronic worker," and that those positions are available in significant numbers in the national economy.  (Tr. 22-23 ¶ 10).  For that reason, the ALJ concluded that Holloway was not disabled, within the meaning of the Act, and he denied her applications for benefits.  (Tr. 23-24).

On June 28, 2013, Plaintiff requested an Appeals Council review of the ALJ's decision. (Tr. 9).  SSA regulations provide that the Appeals Council will grant a request for a review if: (1) "there is an apparent abuse of discretion by the ALJ;" (2) "an error of law has been made;" (3) "the ALJ's action, findings, or conclusions are not supported by substantial evidence;" or (4) "there is a broad policy issue which may affect the public interest."  20 C.F.R. §§ 404.970 and 416.1470.  On July 24, 2014, the Appeals Council denied Holloway's request, finding that no applicable reason for review existed.  (Tr. 1-4).  With that ruling, the ALJ's decision became final.  *See* 20 C.F.R. §§ 404.984(b)(2) and 416.1484(b)(2).  On September 29, 2014, Plaintiff

---

3.  A claimant is presumed to be "disabled" if her impairments meet, or equal in severity, a condition that is listed in the appendix to the Social Security regulations.  *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994).

filed this lawsuit, pursuant to section 205(g) of the Act (codified as amended at 42 U.S.C. § 405(g)), to challenge that decision. (Complaint, Docket Entry No. 1). Subsequently, the parties filed cross-motions for summary judgment. Having considered the pleadings, the evidence submitted, and the applicable law, the court concludes that Defendant's motion should be granted, and that Plaintiff's motion should be denied.

## II. Standard of Review

In social security disability cases, the court's review is limited to determining: "(1) whether substantial evidence supports the Commissioner's decision[;] and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999) (citing *Brock v. Chater*, 84 F.3d 726, 727 (5th Cir. 1996)). "Substantial evidence" is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Copeland v. Colvin*, 771 F.3d 920, 923 (5th Cir. 2014); *Audler v. Astrue*, 501 F.3d 446, 447 (5th Cir. 2007) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It is "more than a mere scintilla and less than a preponderance." *Copeland*, 771 F.3d at 923; *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000). "In determining whether substantial evidence of disability exists, th[e] court weighs four factors: (1) objective medical evidence; (2) diagnoses and opinions; (3) the claimant's subjective evidence of pain and disability; and (4) the claimant's age, education, and work history." *Perez*, 415 F.3d at 462.

In applying the "substantial evidence" standard on review, the court must scrutinize the record to determine whether such evidence is present. *Id.* at 461; *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001); *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). But the court may not "reweigh the evidence in the record nor try the issues *de novo*, nor substitute [its] judgment

for that of the [Commissioner], even if the evidence preponderates against the [Commissioner]'s decision." *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Copeland*, 771 F.3d at 923; *see Perez*, 415 F.3d at 461 ("Conflicts of evidence are for the Commissioner, not the courts, to resolve.").   "If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed."   *Perez*, 415 F.3d at 461 (citing *Richardson*, 402 U.S. at 390). "A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision."   *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001) (quoting *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000)).

## III. Discussion

Plaintiff challenges the ALJ's findings on four grounds.  First, Holloway argues that the ALJ erred, because he gave inadequate weight to the medical opinion from her treating physician, Dr. Matasha L. Russell.  (Pl.'s Mem. 16-23).  Next, Plaintiff challenges the mental RFC determination made by the ALJ, claiming that it "runs contrary to all medical opinion evidence in the record."  (*Id.* at 23-24).  Third, Plaintiff contends that the ALJ erred in his assessment of her credibility.  (*Id.* at 24-26).  Plaintiff contends, specifically, that the ALJ "failed to consider the significant side effects of [her] medications," and that he relied on "boilerplate language" to make his credibility findings.  (*Id.*).  Finally, Plaintiff argues that the ALJ's step five determination is not supported by substantial evidence, because he erred in determining her RFC and credibility.  (*Id.* at 26-27).  Defendant insists, however, that the ALJ properly considered all of the available evidence, and followed the applicable law, in determining that Plaintiff is not disabled.  (Def.'s Mem. 3-5).

***Medical Facts, Opinions, and Diagnoses***

The earliest medical records show that, on July 19, 2006, Holloway sought treatment from a family practitioner, Dr. Larry R. Butcher, at Acres Home Health Center ["Acres Home"] in Houston, Texas.  (Tr. 468-70).  Holloway complained of radiating lower back pain and right leg numbness, due to a 1991 car accident.  (Tr. 468).  She reported that the pain had progressively worsened over the past three weeks.  (*Id.*).  Upon examination, Dr. Butcher observed mild pain on palpation of the lumbosacral spine, but found that Holloway's extremities, peripheral pulses, and neurological sensations were all normal.  (Tr. 469).  He ordered a lumbar spine x-ray, which showed the following: "Vertebral bodies and interspaces are well maintained. No fracture or subluxation is noted.  There is a malleable reconstruction plate fixation of the right [hip] bone following prior trauma or surgery.  The lumbar spine is essentially normal."  (Tr. 469-70).  Dr. Butcher diagnosed Plaintiff as suffering from sciatica and a panic disorder.  (Tr. 469).  He prescribed Sertraline (antidepressant), Cyclobenzaprine (muscle relaxant), Propoxyphene (pain reliever), and Clonazepam (anti-anxiety), and advised her to return if her symptoms did not improve.  (Tr. 469-70).

On September 13, 2006, Holloway returned to Dr. Butcher for a follow-up examination. (Tr. 465-67).  Holloway complained that she had been "gaining too mu[ch] weight," and that the pain in her lower back had become "slightly worse."  (Tr. 465-66).  Upon examination, however, Dr. Butcher observed "no pain to palpitation" of the lumbosacral spine.  (Tr. 466).  Holloway's blood pressure was found to be slightly elevated at 132/102.  (*Id.*).  Dr. Butcher determined that Holloway suffered from hypertension, esophageal reflux, and sciatica.  (*Id.*).  He prescribed Hydrochlorothiazide (for blood pressure) and Esomeprazole (for reflux).  (Tr. 467).

Approximately four months later, on January 24, 2007, Holloway went back to Dr.

Butcher. (Tr. 462-64). During that visit, Holloway reported "feeling well," and denied any chest pain, palpitations, difficulty breathing, or peripheral edema. (Tr. 463). She stated, however, that she had stopped taking her Hydrochlorothiazide medication, because it caused nausea and vomiting. (*Id.*). Upon examination, Dr. Butcher found "strong peripheral pulses in all extremities," a normal gait, normal reflexes, and "[s]ensation grossly intact." (*Id.*). He prescribed Enalapril (for blood pressure) and Clonazepam, and ordered a CT scan of Plaintiff's lumbar spine. (Tr. 463-64).

On October 6, 2007, Holloway presented to the emergency room at LBJ General Hospital in Houston, Texas, complaining of neck pain. (Tr. 362-63). She reported that the pain had begun a few days earlier, but denied experiencing any trauma. (Tr. 362). Spinal x-rays and lab work were unremarkable. (Tr. 373-74). Holloway was given medication for the pain, and discharged that day. (Tr. 362-63).

The record shows that Holloway saw Dr. Butcher for the last time on March 12, 2008. (Tr. 457-61). During that visit, Holloway complained of right leg pain and depression. (Tr. 457). Dr. Butcher observed paraspinal tenderness. (Tr. 460). He found that Holloway suffered from benign hypertension, sciatica, and depression. (*Id.*). Plaintiff was prescribed Celebrex (anti-inflammatory), Propoxyphene, Cyclobenzaprine, Sertraline, and Hydrochlorothiazide. (*Id.*).

Almost one and a half years later, on August 18, 2009, Holloway presented to High Desert Health System ["HDHS"] Urgent Care in Lancaster, California. (Tr. 324-26). She complained of pain in her right hip, pelvis, and groin due to a recent fall. (Tr. 324). She also requested a refill of her pain medication. (*Id.*). Treatment notes reveal that Plaintiff had a "pronounced limp," and that she used a cane to walk. (*Id.*). It was noted that Holloway had

fractured her pelvis in a 2001 car accident, and that the fracture had been surgically repaired with fixation hardware.  (*Id.*).  X-rays confirmed the presence of a "[m]arkedly comminuted fracture of the right iliac hip," which was "transfixed with [a] curved metallic plate and multiple threaded screws," but revealed "no evidence of a recent fracture or dislocation," and "no appreciable degenerative changes."  (Tr. 343-44).  Holloway was prescribed Propoxyphene for her pain.  (Tr. 324).  She was instructed to make an appointment with her primary care physician.  (*Id.*).

On September 19, 2009, Holloway returned to HDHS Urgent Care, complaining of a gastrointestinal problem.  (Tr. 321-23).  She was diagnosed with GERD, and given a prescription for Omeprazole.  (Tr. 323).  Sixteen days later, on October 5, 2009, Plaintiff went back to HDHS Urgent Care.  (Tr. 319-20).  She complained of right leg pain and requested refills of her pain and anxiety medications.  (Tr. 319).  During that visit, Holloway was observed to have an "alert" and "appropriate" mood.  (*Id.*).  She was referred to an orthopedic surgeon, a psychiatrist, and a primary care physician.  (Tr. 319-20).

On October 16, 2009, Holloway sought treatment from a family practitioner, Dr. G.B. Ha'eri, at HDHS Primary Care Clinic.  (Tr. 317-18).  Holloway complained of pain on the right side of her pelvis.  (Tr. 317).  Dr. Ha'eri examined Plaintiff and observed tenderness in her right pelvis and legs.  (*Id.*).  X-rays showed an "old and healed" fracture on the right ilium.  (*Id.*).  Dr. Ha'eri recorded that the plates and screws in the fixation hardware appeared "loose and prominent."  (*Id.*).  Dr. Ha'eri diagnosed Holloway as suffering from "irritating hardware" on the right side of her pelvis, and referred her to an orthopedic surgeon for further evaluation.  (Tr. 317-18).

On November 4, 2009, Holloway presented to Dr. Tahir Khan at HDHS Primary Care Clinic.  (Tr. 309-16).  She complained of right hip pain and requested refills of her medications.

(Tr. 310).  Plaintiff reported that she required a cane to ambulate.  (*Id.*).  Dr. Khan observed trochanteric tenderness near the right iliac crest.  (*Id.*).  He recorded that Holloway walked with a limp in her right leg.  (*Id.*).  Dr. Khan determined that Plaintiff suffered from "right hip pain," "off and on" right leg edema, a panic disorder, hypertension, dyslipidemia,[4] and GERD.  (Tr. 310-11).  He prescribed Furosemide (diuretic), Potassium Chloride, Omeprazole, Simvastatin (for high cholesterol), Cyclobenzaprine, Clonazepam, and Propoxyphene, but advised her to discontinue taking Bumetanide.  (Tr. 311).  Dr. Khan also referred Holloway to a mental health clinic.  (*Id.*).

On December 21, 2009, Holloway again saw Dr. Khan for a follow-up examination.  (Tr. 301-06).  Holloway complained of a "sharp" and "shooting" pain in her right hip, which she described as "unbearable."  (Tr. 301, 304).  She admitted, however, that she was "walking more," and that she had "less leg swelling."  (Tr. 301).  Holloway complained that her Clonazepam medication "d[id] not help with anxiety episodes," and that Motrin "d[id] not help with pain."  (*Id.*).  She further reported that she had stopped taking Furosemide and Potassium Chloride.  (*Id.*).  Dr. Khan prescribed Fenofibrate (for high cholesterol), in addition to Plaintiff's other medications, but advised her to discontinue taking Furosemide, Potassium Chloride, and Clonazepam.  (Tr. 302).  He again advised Holloway to schedule an appointment at a mental health clinic, and encouraged her to follow-up with an orthopedic surgeon.  (*Id.*).

Holloway presented to HDHS Urgent Care for medication refills on January 14, 2010, February 1, 2010, and March 4, 2010.  (Tr. 226-34).  Treatment notes from those visits reveal varying complaints of lower back, right leg, and right hip pain.  (*See id.*).  Holloway reported that

---

4.  "Dyslipidemia" is "a condition marked by abnormal concentrations of lipids or lipoproteins in the blood." Dyslipidemia, MERRIAM WEBSTER DICTIONARY, *available at* http://www.meriam-webster.com/medical/dyslipidemia (last visited March 16, 2016).

she was hoping to undergo pelvic surgery, but claimed that she had been "unable to get an appointment."  (Tr. 228).  During each visit, she was advised to follow up with her primary care physician, and to return to urgent care as needed.  (Tr. 227, 232-33).

On April 1, 2010, Holloway presented to Dr. Khan for an annual health exam.  (Tr. 286-92).  She reported a "throbbing" pain in her right leg, which she rated as "7/10" on the pain scale.  (Tr. 286).  Upon examination, Dr. Khan observed an "abnormal" range of motion in the right hip, but found no evidence of edema.  (Tr. 287).  Holloway had a "normal gait," "sensation intact," and "5/5 muscle strength globally."  (*Id.*).  Dr. Kahn again advised Holloway to seek mental health treatment.  (*Id.*).  Holloway was prescribed Fenofibrate, Omeprazole, Cyclobenzaprine, Clonazepam, and Hydrocodone (pain reliever).  (*Id.*).

Five days later, on April 6, 2010, Holloway presented to HDHS Urgent Care, complaining of radiating pain in her right hip and leg.  (Tr. 284-85).  She reported that she was allergic to her Hydrocodone medication.  (Tr. 284).  She was given an unknown pain medication, and discharged the same day.  (Tr. 284-85).

On April 28, 2010, Holloway sought treatment from Dr. Tommy Leong, a physician substituting for Dr. Khan at the HDHS Primary Care Clinic.  (Tr. 281-83).  During that visit, Holloway complained of an injury to her left leg, as well as a "sharp" pain in her right hip and pelvis.  (Tr. 281).  She requested a prescription for Propoxyphene instead of Hydrocodone, and demanded a higher dose of Clonazepam.  (*Id.*).  Dr. Leong noted that Holloway had not yet made an appointment at the mental health clinic.  (*Id.*).  He increased the dosage of Plaintiff's Klonopin, but warned her that she must see a mental health professional for subsequent refills.  (Tr. 282).

On May 3, 2010, Holloway was seen by Dr. Khan for "throbbing" and "sharp" right hip

12

pain.  (Tr. 274-80).  Treatment notes from that visit reveal that Holloway was generally "doing better."  (Tr. 274).  She was observed to be "alert and in no acute distress."  (*Id.*).  Dr. Khan recorded that Holloway's panic disorder symptoms were "better."  (*Id.*).

On May 24, 2010, Holloway sought treatment from a clinical psychologist, Dr. Glen H. Arnold, at Los Angeles County High Desert Hospital.  (Tr. 273).  Holloway complained of a depressed mood, decreased energy, insomnia, and irritability.  (*Id.*).  She reported that she had been sexually abused, between the ages of two and fourteen, by several of her relatives.  (*Id.*).  She also claimed that she had attempted suicide in 1985, but denied any recent suicidal ideation, plan, or intent.  (*Id.*).  Dr. Arnold diagnosed Holloway as suffering from major depression and PTSD.  (*Id.*).

On May 27, 2010, Holloway presented to HDHS Urgent Care, complaining of right hip joint pain.  (Tr. 270-72).  She reported that the pain had begun a few days earlier, and that her medications were not helping.  (Tr. 270-71).  She was prescribed an unknown medication, and discharged that day.  (Tr. 272).

Holloway had four appointments with Dr. Khan between June 2010, and January 2011.  (Tr. 240-46, 251-69).  Treatment notes from those visits are mostly unremarkable.  They reveal no complaints of persistent or increased pain.  On June 9, 2010, Dr. Khan observed "no acute problem[s]."  (Tr. 264).  He noted that Plaintiff's right leg edema was "better without meds," and that her panic disorder symptoms were "better."  (*Id.*).  At a July 15, 2010 appointment, Holloway complained of a "sharp" hip pain, which she rated as "5/10."  (Tr. 257).  On September 13, 2010, Holloway rated her right leg pain as "10/10."  (Tr. 251).  Plaintiff was referred to a physical therapist, who prescribed a single point cane with a sure grip handle.  (Tr. 252, 345-46).  On January 20, 2011, Plaintiff complained of "sharp" and "shooting" bilateral leg

13

pain, which she rated as "10/10." (Tr. 240). Her dyslipidemia was found to be "improving." (*Id.*).

On June 13, 2011, Holloway sought treatment at HDHS Urgent Care for a "sharp" pain under her right knee cap. (Tr. 235-37). She reported that she was unable to sleep due to the pain, which had begun two days earlier. (Tr. 235). X-rays of the right knee were unremarkable. (Tr. 338-39). Plaintiff received a Toradol injection for the pain. (Tr. 325-36). She was instructed to take her medications as ordered, and to follow-up with her primary care physician. (Tr. 236-37).

Approximately seven weeks later, on July 30, 2011, Holloway presented to the emergency room at LBJ General Hospital, in Houston, Texas, complaining of pain in her right hip and lower leg. (Tr. 356-58). She reported that she had recently moved from California to Texas, and that she had run out of her pain medication one week earlier. (Tr. 356). The examining physician, Dr. Omobalaji H. Olutimehin, recorded that Holloway had been injured in a 2001 car accident, and that she had undergone surgical repair of her hip in California. (*Id.*). He noted that Holloway had "no new trauma or fall," and that she "ha[d] been chronically on [] pain management with no history of physical therapy." (*Id.*). Dr. Olutimehin observed a "[d]ecreased [range of motion] of the hip in all directions," as well as "pain with external rotation," but found "[n]o tenderness to palpitation of the hip joint," and "sensation [] intact to the lower extremities." (Tr. 357). Holloway's mood and affect were normal. (*Id.*). Dr. Olutimehin diagnosed Plaintiff with hip arthralgia. (Tr. 358). She was given pain medication, and instructed to follow up with her primary care physician. (*Id.*).

On August 11, 2011, Plaintiff sought treatment from a family practitioner, Dr. Matasha L. Russell, at Acres Homes, for hip and pelvic pain. (Tr. 449-56). Holloway reported that she had

a history of a pelvic fracture, and that she had undergone "multiple surger[ies] and hardware placement." (Tr. 450).   She told Dr. Russell that she "had gotten [an] xray [sic] done in California that showed her hardware had come loose," and that she "was on the wait list for corrective surgery." (*Id.*).   Upon examination, Dr. Russell observed that Holloway's left hip extension and flexion was "somewhat restricted" to forty-five degrees, and that her right hip was "extremely restricted" to ten degrees. (Tr. 451).  Holloway was found to have an ataxic gait[5] and tenderness to palpitation over the hip joint. (*Id.*).   Dr. Russell also noted that Plaintiff was "ambulating [with a] cane." (*Id.*).   X-rays of Holloway's hips confirmed "[p]late and screw fixation of the right iliac wing, with a large osseous defect at the lateral aspect of the right iliac wing." (Tr. 452).  Dr. Russell recorded that "[t]he margins [were] well-corticated, suggestive of chronic, severe osseous reabsorption." (*Id.*).   She deduced that "[t]he lateral portions of the hardware [were] no longer fixated within the underlying bone." (*Id.*).   Dr. Russell noted that a comparison with prior x-rays "would be helpful." (*Id.*).   She referred Plaintiff to an orthopedic surgeon for an evaluation for "possible corrective surgery." (*Id.*).

On August 29, 2011, Holloway was seen by an orthopedic surgeon, Dr. Joshua Stringer. (Tr. 352-55).  Holloway reported "severe and constant" pain in her right back, pelvis, and hip, which had progressively worsened after a September 2010 "fall onto her buttocks." (Tr. 352). She claimed to have difficulty walking, standing, and lifting her leg, but noted that those symptoms only lasted for approximately two days. (*Id.*).   Dr. Stringer reported that Holloway

---

5.  An "ataxic gait," also known as a "cerebellar gait," is "a staggering gait in which the person walks with a wide base and has difficulty turning."  MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY 207, 297 (5th ed. 1998).   As a result of the condition, "[t]he feet are thrown outward, and the person puts his or her weight first on the heel and then on the toes." *Id.*

had previously undergone open reduction internal fixation ["ORIF"][6] surgery to repair a pelvic ring fracture, and that, by Holloway's account, the wound had become "gangrene (sic)"   (*Id.*). Upon examination, Dr. Stringer observed that Holloway's range of motion in her right hip was "severely limited."   (Tr. 354).   He noted, however, that the physical examination itself was "severely limited" due to Holloway's "weakness and [in]ability to participate."   (*Id.*).   X-rays of the right hip and pelvis revealed a "[b]ony defect through the ilium in the area of the prior ORIF," but showed that the "hardware [was] in place."   (*Id.*).   Dr. Stringer recorded that "[n]ot all of [Holloway]'s symptoms seem to fit w[ith] one another."   (Tr. 355).   He noted, in particular, that she was "terribly weak but ha[d] no signs of atrophy."   (*Id.*).   Dr. Stringer ordered a pelvic CT scan to assess for an occult fracture, and instructed Plaintiff to "obtain all previous records concerning prior [symptoms] and [fractures]."   (*Id.*).

Two weeks later, on September 13, 2011, Holloway returned to Dr. Russell with complaints of increased depression and anxiety.   (Tr. 445-48).   Holloway reported that she had not been taking her psychiatric medications "for months," but denied any suicidal or homicidal ideations.   (Tr. 446).   Dr. Russell noted that Holloway's gait was "still ataxic," but that it "seem[ed] improved from [the] last visit."   (Tr. 447).   She advised Plaintiff to make an appointment for a mental health evaluation.   (Tr. 448).

On October 31, 2011, Holloway again saw Dr. Russell to review the results of CT scans of her pelvis.   (Tr. 440-44).   The images confirmed the presence of "a large osseous defect in the region of the right iliac wing," as well as "[two] malleable plates and screws from [a] prior

---

6. "Open reduction internal fixation," or "ORIF," is a surgical procedure that is performed "to repair fractures that would not heal correctly with casting or sprinting alone."   *Open Reduction and Internal Fixation Surgery (ORIF)*, MOUNT SINAI HOSPITAL, *available at* http://www.mountsinai.org/patient-care/health-library/treatments-and-procedures/open-reduction-and-internal-fixation-surgery (last visited March 16, 2016).   "First, the broken bone is *reduced* or put back into place.   Next, an *internal fixation* device is placed on the bone."   *Id.*   Screws, plates, rods, or pins are typically used to hold the broken bone together.   *Id.*

fixation."  (Tr. 443).  Dr. Russell recorded her impression as follows:

> 1. Absence of the right superolateral ilium suggestive of osseous resorption rather than resection given the persistent overlying hardware.  The superolateral aspect of the right iliac malleable plates and screws are therefore within the adjacent soft tissues.  The posterior and inferior aspects of the plates are well secured within the supra-acetabular and posterior iliac regions.
> 2. Mild asymmetric atrophy of the right gluteal musculature, and moderate atrophy of the right obturator internus and externus.
> 3. Heterotopic ossification of the right gluteus minimus and left anterosuperior iliac spine.

(*Id.*).  Plaintiff was found to suffer from "arthralgia of the hip," "knee pain," "allergic rhinitis, cause unspecified," "GERD," and "esophageal reflux."  (Tr. 444).

On December 5, 2011, Holloway sought treatment from Dr. Lindsay P. Stephenson at LBJ General Hospital.  (Tr. 351).  Dr. Stephenson described Holloway's medical history as follows:

> Ms. Holloway is a 49 year-old lady whom we are following for right hip pain. She was previously seen in clinic and was to obtain her medical records from the facility at which her iliac wing was plated.  To date, we have not received this information . . . She had not attended [physical therapy].  She is getting pain medications from her primary care physician.  She describes pain throughout the right lower extremity, including the right groin, down the right thigh, and posterior to the right knee.  She complains of paresthesia[] of the right lower extremity.  Her history is not completely clear, nor are her symptoms.

(*Id.*).  Upon examination, Dr. Stephenson observed "[d]ecreased sensation throughout right anterior thigh," but "[n]o pain in groin with hip [rotation]."  (*Id.*).  X-rays revealed an "[u]nchanged appearance of the pelvis," and confirmed that the hip joint spaces were "preserved bilaterally."  (Tr. 366-67).  Dr. Stephenson recorded her impression that Plaintiff's symptoms were "not likely related to pelvic hardware," and noted that there was an "[u]nclear etiology for pain at this point."  (Tr. 351).  Holloway was advised to begin physical therapy for core strengthening.  (*Id.*).

Ten days later, on December 15, 2011, Holloway returned to Dr. Russell with complaints

17

of severe hip pain.   (Tr. 436-38).   Dr. Russell recorded that the orthopedic surgeon who examined Holloway "d[id] not believe that the hardware in her pelvis [wa]s the source of her pain."   (Tr. 437).   She wrote that, based on that examination, Plaintiff's pain "d[id] not correspond to any true neurological deficiets [sic]."   (*Id.*).   Dr. Russell also noted that Holloway's "medical record[s] from her pelvic surgery ha[d] still not been obtained."   (*Id.*).

On December 29, 2011, Dr. Russell completed a Medical Release/Physician's Statement on Plaintiff's physical limitations.   (Tr. 347).   In that document, Dr. Russell reported that, due to a pelvic fracture and hip problems, Holloway was unable to work more than twenty hours each week.   (*Id.*).   Dr. Holloway limited Plaintiff, within an eight-hour workday, to four hours of sitting, one hour of walking, ten minutes of lifting or carrying, five minutes of standing, and three minutes of pushing or pulling.   (*Id.*).   Dr. Russell reported that Holloway was completely unable to kneel, squat, bend, or stoop.   (*Id.*).

On January 30, 2012, Holloway was again seen by Dr. Stephenson.   (Tr. 350).   Plaintiff reported "a three week history of increasing bilateral lower extremity edema," as well as fatigue and shortness of breath.   (*Id.*).   Dr. Stephenson observed "2-3 + pitting edema from [the] knees distal[ly]," as well as "venous stasis dermatitis" and hypertension.   (*Id.*).   With respect to the right hip pain, Dr. Stephenson recorded that Holloway was "in need of [an] indium scan to assess for peri-hardware infection."   (*Id.*).   Dr. Stephenson underscored that "the where abouts [sic] of [Holloway's] medical records remains unknown."   (*Id.*).

Two days later, on February 1, 2012, Holloway presented to the emergency room at Cypress Fairbanks Medical Center, complaining of acute chest pain.   (Tr. 377-416).   The examining physician, Dr. Rupin A. Kadakia, found Plaintiff's past medical history to be "relatively unremarkable."   (Tr. 380).   He noted that Holloway smoked approximately one pack of

18

cigarettes each day, and that she had a "[s]ignificant history for obesity and hyperlipidemia." (*Id.*).  A physical exam, x-rays, and lab work revealed no abnormalities.  (Tr. 384-96).  Plaintiff was diagnosed as suffering from "[a]typical chest pain," a "[h]istory of reflux," "[t]obacco use," "[d]yslipidemia," "[o]besity," and a "[f]amily history of heart disease."  (Tr. 381).  She was discharged from the hospital the following day.  (*Id.*).

On February 24, 2012, returned to Dr. Russell for a medication refill.  (Tr. 424-28).  She reported irregular menses and sinus pain.  (Tr. 424).  Dr. Russell noted that her leg edema had improved.  (Tr. 425).  Treatment notes from that visit reveal no complaints of increased or persistent hip pain, or pelvic pain.  (*See* Tr. 424-28).

Later that day, Holloway presented to Dr. Bharath R. Gururaj at Acres Home for a psychiatric evaluation.  (Tr. 428-33).  Dr. Gururaj wrote that Plaintiff had a "long [history of] PTSD related to extensive childhood sexual abuse."  (Tr. 429).  He reported that Holloway had been under psychiatric treatment "off and on" until 2006, and that her symptoms had worsened over the past five years.  (*Id.*).  During the evaluation, Holloway admitted to a "depressed mood," "loss of interests," "poor sleep," "flashbacks," "avoidance of reminders," and "hypervigilance."  (*Id.*).  She stated that she was unable to "sit in a car even when her husband [was] driving," and claimed an inability to "handle intimacy with [her] husband."  (*Id.*).  She further reported that she became "very angry when she s[aw] adults with children;" that she "avoid[ed] crowds and isolate[d] herself;" and that she "ha[d] slowly started to neglect herself." (*Id.*).  Upon examination, Dr. Gururaj found her affect to be "tearful" and her mood to be "sad." (Tr. 430).  Plaintiff was diagnosed as suffering from PTSD and major depressive disorder.  (Tr. 431).  She was prescribed two anti-depressant medications, Duloxetine and Trazadone.  (*Id.*).

On April 4, 2012, Matthew Wong, Ph.D., a non-examining psychologist acting on behalf

of the state, reviewed Holloway's medical records and completed a "Psychiatric Review Technique" form.  (Tr. 472-85).  Dr. Wong concluded that Plaintiff met the listings for major depressive disorder and PTSD.  (Tr. 475, 477).  He stated that Plaintiff was moderately restricted in activities of daily living, in maintaining social functioning, and in maintaining concentration, persistence, and pace.  (Tr. 482).  He found that Plaintiff had not experienced any extended episodes of decompensation.  (*Id.*).

In his mental RFC assessment, completed on the same day, Dr. Wong concluded that Plaintiff was markedly limited in her ability to understand, remember, and carry out detailed instructions.  (Tr. 486).  He further found that she was moderately limited in her ability to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and to be punctual within customary tolerances; to complete a normal workday and workweek without interruptions from her psychologically-based symptoms; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers; and to respond appropriately to changes in the work setting.  (Tr. 486-87).  Ultimately, Dr. Wong concluded that Holloway was "able to understand, remember, and carry out simple instructions, make decisions, concentrate for extended periods, interact w[ith] others, and respond to changes."  (Tr. 488).  On June 25, 2012, that mental RFC assessment was affirmed, as written, by James B. Murphy, Ph.D., another psychologist retained by the state.  (Tr. 515).

On April 5, 2012, Dr. Amita Hegde, a non-examining physician acting on behalf of the state, prepared an evaluation of Holloway's physical RFC.  (Tr. 490-97).  After reviewing the medical evidence, Dr. Hegde made several observations.  Dr. Hegde found that Plaintiff could occasionally lift or carry items weighing up to twenty pounds; she could frequently lift or carry

items weighing up to ten pounds; she could stand or walk for at least two hours in an eight-hour workday; she could sit for approximately six hours in an eight-hour workday; and she could perform an unlimited amount of pushing and pulling, within the weight limits previously stated. (Tr. 491). Under the category of "Postural Limitations," she found that Holloway was capable of frequently stooping, kneeling, crouching, and crawling. (Tr. 492). However, Dr. Hegde found that Plaintiff was only occasionally capable of balancing or climbing stairs, and that she was completely unable to climb ladders, ropes, and scaffolds. (*Id.*). She further found that Holloway had no manipulative, visual, communicative, or environmental limitations. (Tr. 493-94). Dr. Hegde concluded that the alleged severity and limiting effects of Plaintiff's impairments were partially supported by the medical evidence. (Tr. 495). On June 25, 2012, that physical RFC assessment was affirmed, by Dr. Patty Rowley, another physician retained by the state. (Tr. 511).

On May 8, 2012, Holloway sought treatment from Dr. Jennifer Brockington at Northwest Family Medicine Clinic for a cough and sore throat. (Tr. 503-08). Upon examination, Dr. Brockington observed a "bilateral knee and hip deformity," as well as a limited range of motion in that area, but found no evidence of pain or swelling. (Tr. 506). Plaintiff was, once again, advised to see a physical therapist. (Tr. 505).

On December 12, 2012, Holloway presented to Dr. Dana L. Clark at Northwest Family Medicine Center, seeking a refill of her "medication for sleep." (Tr. 517-22). Holloway told Dr. Clark that she had taken anti-depressants in the past, but claimed that the medications had not been effective. (Tr. 518). She reported that she "would like to re-establish with psychiatry." (*Id.*). Plaintiff was found to suffer from "major depression," "panic disorder," "PTSD," "venous insufficiency," "unspecified hyperlipidemia," and "allergic rhinitis, cause unspecified." (Tr.

519).  She was prescribed Trazodone and Cetirizine (an antihistamine), and referred to a clinical

psychiatrist.  (Tr. 519-20).

 The next month, on January 14, 2013, Holloway went back to Dr. Russell for a refill of

her pain medications.  (Tr. 524-26).  Holloway reported "elbow pain," "arthritis," and "severe

hip pain."  (Tr. 525).  Treatment notes from that visit are unremarkable.  Dr. Russell concluded

that Plaintiff suffered from hip arthralgia, knee pain, unspecified hyperlipidemia, and lateral

epicondylitis.  (Tr. 526).

### *Educational Background, Employment History, and Present Age*

 At the time of the hearing, Holloway was fifty years old, and had a tenth-grade education.

(Tr. 54, 118, 153).  Her employment history included a position as a shift manager in the

restaurant industry.  (Tr. 51, 153).

### *Subjective Complaints*

 In her application for benefits, Plaintiff alleged that she is unable to work, because of

"[h]ip problems," "back problems," "leg problems," and "PTSD."  (Tr. 152).  She explained that,

as a result of her physical impairments, she has difficulty standing, walking, sitting, bending,

lifting, reaching, kneeling, climbing stairs, using her hands, completing tasks, following

instructions, concentrating, remembering, understanding, and getting along with others.  (Tr.

184).  She also said that, because of her physical impairments, she cannot sit or stand for more

than a few minutes at a time without "turning numb from the waste [sic] down," and "ach[ing]

uncontrollably," and that, as a result, she is unable to do housework, shop for groceries, babysit

her grandchildren, or groom herself.  (Tr. 179-82).  She stated that, on a typical day, she is

"either laying down in bed or reclined on the couch [for] 90% of the time."  (Tr. 179).  She

noted, however, that she goes outside "1 or 2 times an hour to smoke," and that she cooks dinner

for her family "every 2 or 3 days."  (Tr. 181-82).

Holloway reported that her medications make her "confus[ed]," slow[] down [her] consitration [sic]," and adversely affect her memory and motor skills.  (Tr. 186).  She stated that she is unable to drive "due to anxiety attacks," and that, over the past few years, she has become "more and more withdrawn."  (Tr. 182, 184).  In addition, Holloway reported that, due to her cognitive difficulties, she is unable to pay bills or handle a savings account.  (Tr. 182).

At the hearing, Holloway testified that she is unable to work due to "muscle and nerve damage" in her right leg, stemming from a pelvic fracture that she sustained in a July 2001 car accident.  (Tr. 33).  She testified that, during that collision, her right pelvic bone "hit the steering wheel" and "snapped into [sic]."  (*Id.*).  Holloway stated that an orthopedic surgeon "put some metalwork in [her fractured pelvic bone] to hold it all together," but that, in September 2001, the surgical incision "came back open," and, as a result, she developed a gangrene infection.  (*Id.*).  Holloway testified that, since that time, she has had progressively worsening pain and numbness in her right leg.  (Tr. 33-34).  She further testified that she "can almost feel the metal" in her pelvis, because "most of the muscle tissue that was around [the hardware] has deteriorated."  (Tr. 34).  Plaintiff stated that, due to her limited finances, she has been unable to have the hardware surgically removed.  (Tr. 35).

Holloway testified to the severity and debilitating effects of the physical and mental impairments from which she suffers.  She stated that, due to the pain in her right hip, she is unable to sit for more than ten minutes at a time.  (Tr. 41).  She testified that she requires a cane to ambulate, due to problems with her balance.  (Tr. 36).  Holloway reported that, with the cane, she is able to stand for no more than ten minutes at a time.  (Tr. 37).  In addition, she reported that she is unable to "do any lifting at all."  (Tr, 44-45).  She reported that she has constant

swelling in her feet and legs.   (Tr. 42-43).   Holloway told the ALJ that, due to her medical conditions, she is unable to do laundry, go grocery shopping, get the mail, or take out the trash. (Tr. 38-39).   She further stated that she needs help getting into and out of the bathtub.   (Tr. 41-42).   Plaintiff admitted, however, that she is able to cook "quick and easy" meals for her family, wash dishes, and load the dishwasher.   (Tr. 39).   She testified that, due to the side effects of her pain medications, she has problems with depth perception and drowsiness.   (Tr. 44).   She stated that she had "quit driving," because she was "taking too much medication."   (Tr. 43).

Plaintiff told the ALJ that she suffers from an anxiety disorder, which causes her to have panic attacks when she is driving, as well as difficulty with concentration.   (Tr. 45-46).   She further reported that she has intrusive thoughts "all the time," due to PTSD.   (Tr. 46).   Holloway admitted that her psychiatric conditions had improved with medication.   (Tr. 47).   She stated, however, that she had "been off medication for awhile," because her insurance had lapsed.   (*Id.*).

Holloway reported that she currently lives in a ground floor apartment with her husband, her adult daughter, and her four year-old granddaughter.   (Tr. 38-40).   She stated that she spends most of her day at home, by herself, taking care of her granddaughter.   (Tr. 39-40).

### *Expert Testimony*

At the hearing, the ALJ also heard testimony from a board certified psychiatrist, Dr. Hubert James Stewart.   (Tr. 48-50).   From his review of the available medical records, as well as from the hearing testimony, Dr. Stewart testified that, due to her mental impairments, Holloway suffered from "moderate restrictions of her activities of daily living, moderate difficulties in maintaining social function, moderate difficulties in maintaining concentration, persistence and pace, and no documented decompensation."   (Tr. 49-50).   Dr. Stewart concluded, however, that Holloway's condition did not meet or equal any of the listed impairments.   (Tr. 50).   He testified

24

that he agreed with the mental RFC assessment completed by the non-examining state agency medical consultant, Dr. Matthew Wong.  (*Id.*).

The ALJ also heard testimony from Karen E. Neilson, a vocational expert.  (Tr. 50-53). Ms. Nielson characterized Holloway's prior work experience, as a food industry shift supervisor, as "light," in exertional level, and "skilled."  (Tr. 51).  The ALJ then posed the following questions to Ms. Nielson:

> Q  So based on her age, education, and past work experience, assuming I find she has to alternate between [] sitting and standing at will, lift up to 20 pounds at a time frequent carrying objects up to 10 pounds, no heights or climbing such things as ladders, ropes, scaffolds, occasionally she can climb ramps or stairs, and occasionally she has balancing problems as she talked about.  She uses a cane. She can understand and remember and carry out simple instructions and make simple decisions, attend and concentrate for extended periods, interact adequately with co-workers and supervisors and respond to changes in the routine work setting.  So with that, can she do her past relevant work?
>
> A  No, Your Honor.
>
> Q  Does she have skills that would transfer?
>
> A  Not to a simple, no, unskilled, no.
>
> Q  Could you give me three examples of unskilled, please?
>
> ***
>
> A  Okay.  Yes. . . . [A] laundry sorter, . . . [a]n assembly press operator, . . . [or an] [e]lectronic worker.

(Tr. 51-52).

Plaintiff's counsel then posed a series of hypothetical questions to the vocational expert, as follows:

> Q  If, if the individual had to have the use of her can[e] constantly would the light jobs that you listed be available?

A  The laundry sorter job because they can sit and stand she could do.  The assembly press operator she could.  Electronics worker, I would say no because they sometimes [] have to carry things over to another place.

Q  Okay.  And is there generally an erosion of the light unskilled job base [] if the hypothetical individual requires the use of a cane?

***

A  Those three jobs, no.

***

Q  [I]f the individual were to miss more than three days of work out of the month because of . . . right leg pain at the hip and pelvis area and the interference of psychological symptoms would the jobs that you listed remain available?

A  No.  Missing in excess of two and a half to three days on a repetitive basis eliminates competitive employment.

(Tr. 50-53).

### *The ALJ's Decision*

Following the hearing, the ALJ made written findings on the evidence.  (Tr. 13-24). From his review of the record, he determined that Holloway suffered from "obesity," "gastroesophageal reflux disease (GERD)," "status-post fractured hip," "depression," and "posttraumatic stress disorder (PTSD)," and that those conditions were "severe."  (Tr. 15).  The ALJ concluded, however, that Holloway did not have an impairment, or any combination of impairments, which met, or equaled in severity, the requirements of any applicable SSA Listing. (Tr. 16-17).  Next, the ALJ assessed Holloway's RFC, and found that she can "perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she must avoid heights and climbing ropes, ladders, and scaffolds."  (Tr. 18).  The ALJ found that Holloway "occasionally uses a cane for balance," and that she "can occasionally climb ramps and stairs."  (*Id.*).  He further found that Plaintiff "can understand, remember, and carry out simple instructions, make

26

simple decisions, attend and concentrate for extended periods, interact appropriately with supervisors and coworkers, and respond to changes in a routine work-setting." (*Id.*). The ALJ concluded that, while Holloway's impairments could reasonably be expected to cause the alleged symptoms, her testimony regarding the intensity, persistence, and limiting effects of her conditions was "not entirely credible," as it was inconsistent with the RFC assessment. (Tr. 19, 21). The ALJ also concluded that "[t]he medical evidence of record does not fully support the extent of limitations alleged by the claimant." (Tr. 19). Based on the vocational expert's testimony, the ALJ determined that Holloway was unable to return to her previous job as a shift supervisor in the food industry. (Tr. 22). However, he determined that Plaintiff was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (Tr. 23). He concluded that Holloway would be able to perform such jobs as a laundry sorter, an assembly press operator, and an electronic worker. (*Id.*). Ultimately, he concluded that Holloway was not under a "disability," as defined by the Act, and he denied her application for benefit. (Tr. 23-24). That denial prompted Holloway's request for judicial review. (*See* Complaint).

In this action, Plaintiff claims that the ALJ's determination, that she is not under a "disability," is not supported by substantial evidence. (Pl.'s Mem. 5). Specifically, she argues, first, that the ALJ failed to give sufficient weight to the opinion from her treating physician, Dr. Russell. (*Id.* at 16-23). In her second argument, Plaintiff contends that the ALJ's assessment of her mental RFC is inconsistent with the medical evidence. (*Id.* at 23-24). Next, Plaintiff argues that the ALJ "failed to provide any sound reasoning" to support his assessment of her credibility. (*Id.* at 24-26). Finally, Holloway contends that "the ALJ's errors in determining [her] RFC and evaluating [her] credibility render the [ALJ's] Step Five finding unsupported by substantial

evidence." (*Id.* at 26-27).

It is well-settled that judicial review of the Commissioner's decision is limited to the determination of whether it is supported by substantial evidence, and whether the ALJ applied the proper legal standards in making it. *See Copeland v. Colvin*, 771 F.3d 920, 923 (5th Cir. 2014); *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *see generally* 42 U.S.C. § 405(g). Any conflict in the evidence is to be resolved by the ALJ, and not the court. *Copeland*, 771 F.3d at 923. A finding of "no substantial evidence" is proper only if there are no credible medical findings or evidentiary choices that support the ALJ's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

### *Treating Physician's Opinion*

Plaintiff first argues that the ALJ failed to properly evaluate the opinion given by her treating physician, Dr. Russell. (Pl.'s Mem. 16-23). The "opinion," which Plaintiff references, is a Medical Release/Physician's Statement, which was completed by Dr. Russell on January 2, 2012. (*See* Tr. 347). Plaintiff argues that the ALJ "provide[d] a patently inadequate basis" for discounting that opinion. (Pl.'s Mem. 6-9).

Generally, "the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's injuries, treatments, and responses should be accorded considerable weight in determining disability." *Perez v. Barnhart*, 415 F.3d 457, 465-66 (5th Cir. 2005). But a treating physician's opinion is not dispositive. *Id.* Indeed, "the ALJ is free to assign little or no weight to the opinion of any physician for good cause." *Holifield v. Astrue*, 402 F. App'x 24, 26 (5th Cir. 2010) (citing *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000)). "Good cause" for rejecting a treating source opinion exists if the treating physician's statements are "brief and conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques, or

otherwise unsupported by the evidence." *Perez*, 415 F.3d at 466 (quoting *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994)); *accord Hernandez v. Barnhart*, 202 F. App'x 681, 682-83 (5th Cir. 2006) ("An ALJ can discount the weight of the opinions of treating physicians relative to the opinions of others if the treating physician's opinion and diagnosis is unsupported."). Ultimately, conflicts among the various medical opinions of record are within the purview of the Commissioner, and not the courts, to resolve. *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990); *see also Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995) (The ALJ has "sole responsibility for determining a claimant's disability status.").

In his written decision, the ALJ expressly considered the information Dr. Russell set out in the Medical Release/Physician's Statement. (*See* Tr. 21-22). He found, however, that Dr. Russell's opinion "depart[ed] substantially from the rest of the evidence of record." (Tr. 22). He also found that "the course of treatment pursued by the doctor has not been consistent with what one would expect if the claimant were truly disabled, as the doctor has reported." (Tr. 21). In addition, the ALJ underscored that Dr. Russell's "opinion" was signed on January 2, 2012, approximately seven and a half months prior to Holloway's alleged onset date. (*Id.*).

Here, the ALJ had "good cause" to discount Dr. Russell's opinion, because it was unsupported by objective clinical findings. The Medical Release/Physician's Statement, which Dr. Russell completed, is a single-page form, which consists of boxes and "fill-in-the-blank" answers. (*See* Tr. 347). Notably, the information on the form does not contain any explanatory notes, or references to objective medical tests, and it provides no data regarding Plaintiff's medical history or present complaints. *See Neely v. Barnhart*, 512 F. Supp. 2d 992, 997-98 (S.D. Tex. 2007) (finding that the ALJ did not err by declining to consider a treating physician's opinions, because the forms underlying the opinions "contain[ed] nothing more than conclusory

statements," and "fail[ed] to reference any medical records or notes").  On that form, Dr. Russell reported that Holloway experiences significant functional limitations, due to a history of a pelvic fracture and hip arthralgia.  (Tr. 347).  But, as the ALJ correctly pointed out, there is ample conflicting evidence in the record that Holloway's pain was not as severe as she alleged.  (Tr. 19-20).  For instance, in February 2012, May 2012, and December 2012, Holloway did not complain of hip or back pain, at all.  (Tr. 377-416, 424-28, 503-08, 517-22).  The record also reveals that, despite her treating physicians' repeated requests, Plaintiff did not attend physical therapy, or obtain her past medical records.  (*See* Tr. 350-51, 356, 437).

Further, Dr. Russell's own treatment notes do not support the functional limitations that she reported in the Medical Release/Physician's Statement.  From August 2011, until January 2012, Dr. Russell examined Holloway on four occasions.  (*See* Tr. 436-38, 440-56).  Those examinations were, for the most part, unremarkable.  Treatment notes from those visits do not reference any regular testing of Plaintiff's functional limitations, relating to her gait, range of motion, or extremity strength.  (*See id.*).  In fact, on December 15, 2011, Dr. Russell wrote that, in her opinion, Plaintiff's pain "d[id] not correspond to any true neurological deficiets [sic]." (Tr. 437).

In addition, Dr. Russell's opinion is also inconsistent with Plaintiff's own testimony.  Dr. Russell suggested that Plaintiff could not stand for more than five minutes each day, walk for more than one hour, or sit for more than four hours.  (Tr. 347).  Plaintiff testified, however, that she regularly prepares "quick and easy" meals for her family, washes dishes, loads the dishwasher, takes care of her granddaughter, and, on occasion, accompanies her husband to Walmart.  (Tr. 39-40, 46).  Given this evidence, the ALJ did not err in his decision to assign "very little weight" to Dr. Russell's opinion.

*Mental RFC Assessment*

Holloway next argues that the ALJ's mental RFC determination was not supported by substantial evidence, because it is "inconsistent" with the assessment completed by non-examining state agency consultant, Dr. Matthew Wong.  (Pl.'s Mem. 23).  Plaintiff argues, specifically, that the ALJ's mental RFC assessment conflicts with Dr. Wong's findings that she is "moderately limited" in her abilities "to maintain attention and concentration for extended periods;" "to interact with supervisors and coworkers;" and "to respond to changes in a routine work-setting."  (*Id.* at 23-24; *see* Tr. 486-87).  In addition, Plaintiff contends that the ALJ completely disregarded Dr. Wong's findings that she is "moderately limited" in her abilities "to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances;" and "to complete a normal workday/workweek without interruptions from psychologically based symptoms."  (Pl.'s Mem. 24; *see* Tr. 486-87).  According to Plaintiff, "the ALJ's rejection of any limitation in these areas . . . is an impermissible substitution of his own lay opinion."  (Pl.'s Mem. 24).

It is well-settled that all medical opinions are to be considered in determining the disability status of a claimant.  20 C.F.R. §§ 404.1527(b), 416.927(b).  However, it is also undisputed that the ALJ has "sole responsibility for determining a claimant's disability status." *Newton*, 209 F.3d at 455 (quoting *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994)).  In making that determination, an ALJ will evaluate medical source opinions that discuss the nature and severity of a claimant's impairment.  20 C.F.R. § 404.1527(c)(2).  In evaluating the opinion of a non-treating physician, an ALJ is free to incorporate only those limitations that he finds "consistent with the weight of the evidence as a whole."  *Andrews v. Astrue*, 917 F. Supp. 2d 624, 642 (N.D. Tex. 2013) (quoting *Hernandez v. Astrue*, 278 F. App'x 333, 338 (5th Cir. 2008)

(per curiam)).  "[A]lthough the opinion of an examining physician is generally entitled to more weight than the opinion of a non-examining physician, the ALJ is free to reject the opinion of any physician" when he has good cause to do so.  *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987) (quoting *Oldham v. Schweiker*, 660 F.2d 1078, 1084 (5th Cir. 1981)).

Here, the ALJ's mental RFC finding is supported by substantial evidence.  In his written decision, the ALJ concluded that Plaintiff "can understand, remember, and carry out simple instructions, make simple decisions, attend and concentrate for extended periods, interact appropriately with supervisors and coworkers, and respond to changes in a routine work-setting." (Tr. 18).  From his review of the record, the ALJ found that Holloway did have a history of PTSD, depression, and drug and alcohol abuse, but that she "ha[d] not generally received the type of mental health treatment one would expect given [her] allegations of difficulty concentrating and anxiety."  (Tr. 20).  The ALJ remarked that, in the previous seven years, Holloway had sought mental health treatment only once, in February 2012.  (*Id.*; *see* Tr. 428-33). He further noted that, after that initial visit, Plaintiff had discontinued taking psychiatric medications, because she found them to be ineffective.  (Tr. 20).

In evaluating Holloway's mental RFC, the ALJ gave the "greatest weight" to Dr. Wong's mental RFC assessment.  (Tr. 21; *see* Tr. 486-87).  Although the ALJ did not expressly mention all of Dr. Wong's findings, he referenced his ultimate opinion that Holloway "retains the ability to understand, remember, and carry out simple instructions, make decisions, concentrate for extended periods[,] interact with others, and respond to changes."  (Tr. 21; *see* Tr. 488). Therefore, the ALJ's mental RFC determination cannot be said to be inconsistent with Dr. Wong's opinion.  Given the other evidence in the record, it is reasonable to conclude that the ALJ gave meaningful consideration to Dr. Wong's mental RFC assessment, in its entirety, and

subsequently declined to incorporate certain portions of that assessment into his decision.

On this record, the ALJ properly exercised his responsibility as fact finder in weighing the evidence, and in choosing to incorporate limitations into the mental RFC assessment that were supported by the record. *See Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994). For that reason, the ALJ's mental RFC assessment was supported by substantial evidence.

### *Credibility Assessment*

Holloway also claims that the ALJ erred in assessing her credibility. (Pl.'s Mem. 24-26). Plaintiff contends, specifically, that the ALJ "failed to properly provide any sound reasoning as to why [her] allegations as to her daily activities should be discredited, besides boiler plate assertions." (*Id.* at 26). She argues further that the ALJ "failed to consider" her testimony regarding "the significant side effects of [her] medications." (*Id.* at 24).

In making his disability determination, the ALJ "must consider a claimant's subjective symptoms." *Wingo v. Bowen*, 852 F.2d 827, 830 (5th Cir. 1988); *Wren*, 925 F.2d at 128. However, there is no question that an ALJ has discretion to weigh the credibility of the testimony presented, and that his judgment on that issue is entitled to considerable deference. *See Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990); *Hollis v. Bowen*, 837 F.2d 1378, 1385 (5th Cir. 1988). In fact, an ALJ is free to accept or reject a claimant's subjective statements, so long as his reasons for doing so are made clear. *See Falco*, 27 F.3d at 164.

At the hearing, Holloway told the ALJ that, on an average day, she experiences constant numbness and throbbing in her lower right extremity, and that she requires a cane for balance. (Tr. 33, 36-37). She also reported that she can sit for only ten minutes at a time, stand for only seven minutes at a time, and walk only from the front door of her apartment to her car. (Tr. 37-38, 41). Holloway told the ALJ, as well, that she needs help in getting in and out of the bathtub.

33

(Tr. 42).   Plaintiff further testified that she regularly takes prescribed narcotic medication, without which, she would be in constant pain.  (Tr. 43-44).

In his written decision, the ALJ specifically referenced Plaintiff's subjective complaints of pain.  (*See* Tr. 18-19).  He also cited other parts of the record that corroborate Holloway's testimony about the extent of her daily activities.  (*See* Tr. 19-20).  Nevertheless, the ALJ concluded that Holloway's "statements concerning the intensity, persistence, and limiting effects of [her] symptoms [we]re not entirely credible."  (Tr. 19).  In particular, the ALJ underscored that several of Holloway's treating physicians found her symptoms to be somewhat inconsistent with one another.  (Tr. 19; *see* Tr. 355).  The ALJ also referred to that medical evidence, which suggested that the etiology of Holloway's symptoms was "unclear."  (Tr. 19; *see* Tr. 351).  In addition, the ALJ cited several unremarkable x-rays taken of Holloway's right knee, hip, and pelvis.  (Tr. 19; *see* Tr. 338-39, 440-44).  He also pointed to evidence that Plaintiff was often non-compliant with her prescribed treatment.  *See Robinson v. Astrue*, No. H-09-2497, 2010 WL 2606325, at * 8 (S.D. Tex. Jun. 28, 2010) ("A claimant's non-compliance with treatment is a proper factor for the ALJ to consider in assessing credibility."); *see also Villa*, 895 F.2d at 1024.

Here, it is clear that the ALJ considered both subjective and objective evidence in assessing Plaintiff's credibility.  *See Wingo*, 852 F.2d at 830.  Further, in questioning Holloway's credibility, he expressly referenced the objective medical evidence.  *See Falco*, 27 F.3d at 164. As a result, the ALJ complied with the law in weighing Holloway's credibility, and his decision is, therefore, entitled to considerable deference.  *See Villa*, 895 F.2d at 1024; *Hollis*, 837 F.2d at 1385.

Plaintiff argues, nevertheless, that the ALJ's credibility determination was not supported by substantial evidence, because he did not discuss her testimony regarding the side effects from

34

her pain medication.  (Pl.'s Mem. 24-25).  At the hearing, Plaintiff testified that she had quit driving, because she was "taking too much pain medication."  (Tr. 43).  Plaintiff told the ALJ that the medications make her drowsy and adversely affect her depth perception.  (Tr. 44).

The social security regulations require the ALJ to consider "[t]he type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms."  SSR 96-7p, 1996 WL 374186 (Jul. 2, 1996).  However, "a claimant's subjective complaints must also be corroborated, at least in part, by objective medical evidence." *Eovaldi v. Astrue*, 729 F. Supp. 2d 848, 862 (S.D. Tex. 2010) (citing *Wren*, 925 F.2d at 128-29).

It is true that, in his written decision, the ALJ does not specifically mention any side effects of Plaintiff's pain medications.  (*See* Tr. 13-24).  However, Plaintiff does not point to any evidence in her medical record to show that she actually experienced drowsiness and depth perception issues, because of her pain medication, much less that those side effects affect her ability to work.  *See Eovaldi*, 729 F. Supp. 2d at 862 ("Plaintiff's testimony alone is insufficient to establish that the ALJ should have explicitly addressed the side effects of medication on Plaintiff's ability to do work."); *Malone v. Colvin*, No. H-13-3043, 2015 WL 1291824, at *17 (S.D. Tex. Mar. 16, 2015).  Therefore, the ALJ did not err by failing to discuss Plaintiff's testimony regarding those side effects of her pain medications.  *See Rasmussen v. Astrue*, 254 F. App'x 542, 547 (7th Cir. 2007) (holding that an ALJ's failure to discuss side effects constituted harmless error, because the plaintiff "presented no evidence of her medication's side effects beyond her own testimony," and because "the medical records [did not] support her claim that the drowsiness caused by her medications [wa]s so disabling that she [could] not work"); *Malone*, 2015 WL 1291824, at *17; *see also Clark v. Colvin*, No. H-12-2096, 2013 WL 5967050, at *18 (S.D. Tex. Nov. 6, 2013) ("Given the medical records along with the ALJ's

determination that Clark's testimony was not wholly credible, it is unlikely a different decision would be reached had the ALJ discussed the side effects.").

### Step Five Determination

Finally, Holloway argues that, because the ALJ failed to properly evaluate her RFC and her credibility, his step five determination is not support by substantial evidence.  (Pl.'s Mem. 26-27).  However, as discussed above, the ALJ's RFC and credibility determinations were, in fact, supported by substantial evidence.  For that reason, there is no need to address Plaintiff's step five argument.  *See Renfrow v. Colvin*, No. 3:14-CV-01922-CAN, 2016 WL 286418, at *6 (N.D. Ind. Jan. 25, 2016).

## IV. Conclusion

Accordingly, it is **ORDERED** that Defendant's motion for summary judgment is **GRANTED**, and that Plaintiff's motion for summary judgment is **DENIED**.

This is a **FINAL JUDGMENT**.

The Clerk of the Court shall send copies of the memorandum and order to all counsel of record.

**SIGNED** at Houston, Texas, this 17th day of March, 2016.

**MARY MILLOY
UNITED STATES MAGISTRATE JUDGE**